## H.O.R.S.E. OF CONNECTICUT, INC. *v.* TOWN OF WASHINGTON
### (SC 16313)

Borden, Norcott, Katz, Palmer and Sullivan, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of argument.

Argued January 18—officially released November 20, 2001

*William C. Franklin*, with whom, on the brief, was *Denise M. Cloutier*, for the appellant (defendant).

*Jeffrey J. Tinley*, with whom was *Robert Nastri, Jr.*, for the appellee (plaintiff).

### Opinion

PALMER, J. The plaintiff, H.O.R.S.E.[1] of Connecticut, Inc., appealed to the trial court from the decision of the board of assessment appeals of the defendant town of Washington, claiming that it is a charitable organization, the real property of which is entitled to a tax

---

[1] "The acronym H.O.R.S.E. stands for Humane Organization Representing Suffering Equines." (Internal quotation marks omitted.) *H.O.R.S.E. of Connecticut, Inc.* v. *Washington*, 57 Conn. App. 41, 42 n.1, 746 A.2d 820 (2000).

exemption pursuant to General Statutes (Rev. to 1995) § 12-81 (7).[2] The trial court granted the plaintiff's motion for summary judgment and rendered judgment thereon, from which the defendant appealed to the Appellate Court. The Appellate Court affirmed the trial court's judgment. *H.O.R.S.E. of Connecticut, Inc.* v. *Washington,* 57 Conn. App. 41, 51, 746 A.2d 820 (2000). We granted the defendant's petition for certification to appeal limited to the following two issues: "Did the Appellate Court properly conclude that: (1) there were no material facts in dispute regarding whether the plaintiff's property is used exclusively for charitable purposes under . . . § 12-81 (7); and (2) even if there were no such facts in dispute, as a matter of law the plaintiff is a charitable organization under § 12-81 (7), and uses its property exclusively for charitable purposes?"

---

[2] General Statutes (Rev. to 1995) § 12-81 provides in relevant part: "The following-described property shall be exempt from taxation . . . .

"(7) . . . Subject to the provisions of sections 12-87 and 12-88, the real property of, or held in trust for, a corporation organized exclusively for . . . charitable purposes . . . and used exclusively for carrying out . . . such purposes . . . provided (a) any officer, member or employee thereof does not receive or at any future time shall not receive any pecuniary profit from the operations thereof, except reasonable compensation for services in effecting . . . such purposes or as proper beneficiary of its strictly charitable purposes, and provided (b) in 1965, and quadrennially thereafter, a statement on forms prepared by the secretary of the office of policy and management shall be filed on or before the last day required by law for the filing of assessment returns with the local board of assessors of any town, consolidated town and city or consolidated town and borough, in which any of its property claimed to be exempt is situated. . . ."

Unless otherwise noted, all references in this opinion to § 12-81 (7) are to the 1995 revision.

General Statutes § 12-88 provides in relevant part: "Real property belonging to, or held in trust for, any organization mentioned in subdivision (7) . . . of section 12-81 . . . not used exclusively for carrying out [the purposes stated in that subdivision] but leased, rented or otherwise used for other purposes, shall not be exempt. If a portion only of any lot or building belonging to, or held in trust for, any such organization is used exclusively for carrying out . . . such purposes, such lot or building shall be so exempt only to the extent of the portion so used and the remaining portion shall be subject to taxation."

*H.O.R.S.E. of Connecticut, Inc.* v. *Washington*, 253 Conn. 911, 754 A.2d 161 (2000). We disagree with the Appellate Court's conclusion that the trial court properly determined that there are no material facts in dispute as to whether the plaintiff uses its property exclusively for charitable purposes and, consequently, we reverse the judgment of the Appellate Court.[3]

The following undisputed facts are set forth in the opinion of the Appellate Court. "The [defendant's] board of assessment appeals denied the plaintiff's claim for an exemption from local taxation as to a forty-six acre parcel of land that the plaintiff owns and operates as a farm for injured, distressed and mistreated horses. The plaintiff appealed to the Superior Court, claiming that [its property is exempt from taxation] under § 12-81 (7) because it is a corporation[4] organized exclusively for charitable purposes, and it uses the property exclusively to carry out such purposes. The court noted that the plaintiff's corporate charter reveals that its objectives are to unite into one organization the care of all abused, neglected, unwanted and lost domestic hoofed animals; to provide education and training pertinent to the care of hoofed animals for employees, members and officers, and the community as a whole; and to safeguard, advance and promote the safety and well-being of domestic hoofed animals by political, educational and other community activity. The plaintiff's president, Patricia Wahlers, resides on the property . . . and cares for the horses."[5] (Internal quotation marks

---

[3] We, therefore, need not address the second certified issue.

[4] The plaintiff is a nonstock corporation that was formed in 1982.

[5] We note that the following additional facts are undisputed. Wahlers has worked for the plaintiff on a full-time basis without salary or other monetary compensation since 1989. From time to time, Wahlers has permitted other persons to reside at a house in which she also resides, which is located on the plaintiff's property. Prior to the plaintiff's purchase of that property in 1995, Wahlers did not reside on the plaintiff's property, which was located elsewhere. Wahlers occasionally gives riding lessons and trains horses, sometimes on the plaintiff's property, and she supports herself from the income that she derives from those activities. That income, however, is

omitted.) *H.O.R.S.E. of Connecticut, Inc.* v. *Washington,* supra, 57 Conn. App. 42–43. Additional facts will be set forth as necessary.

The trial court granted the plaintiff's motion for summary judgment, concluding that there was no genuine issue of material fact and, on the basis of the undisputed facts, the plaintiff's property was tax exempt under § 12-81 (7) because the plaintiff is a charitable organization that uses its property exclusively for charitable purposes. On appeal to the Appellate Court, the defendant claimed that the trial court improperly had determined that there were no material facts in dispute. Id., 44. The defendant further claimed that, even if, as the trial court had concluded, there were no material facts in dispute, the plaintiff is not entitled to a property tax exemption under § 12-81 (7). Id., 46. The defendant advanced two arguments in support of this claim: first, the plaintiff does not qualify as a charitable organization for purposes of § 12-81 (7) because its purpose is to serve the well-being of horses, not that of social man; id., 47; and second, even if it is assumed that the plaintiff is a charitable organization within the meaning of § 12-81 (7), it nevertheless is not entitled to a property tax exemption because it does not use its property exclusively for charitable purposes. See id., 48. The Appellate Court rejected the defendant's arguments and affirmed the trial court's judgment. Id., 51. Because we conclude that a genuine issue of material fact exists as to whether the plaintiff uses its property exclusively for charitable purposes, we conclude that summary judgment was

relatively modest and, since 1989, it has not been sufficient to trigger federal tax liability. More than one half of the plaintiff's estimated 1996 income of $56,000 was derived from donations, grants and fund-raisers. Finally, since 1985, the federal government has recognized the plaintiff as a charitable entity that is exempt from federal income taxation under § 501 of the Internal Revenue Code. See 26 U.S.C. § 501 (1994).

inappropriate and, therefore, we reverse the judgment of the Appellate Court.[6]

Before addressing the merits of the defendant's claim, we set forth the applicable standard of review. "The

[6] As we have indicated; see footnote 3 of this opinion; because we conclude that there are material facts in dispute as to whether the plaintiff uses its property exclusively for charitable purposes, we do not reach the second certified issue, which presumes that there are no such disputed facts. If, however, the defendant is correct that the plaintiff is not entitled to an exemption pursuant to § 12-81 (7) because its purpose of serving the well-being of horses is not a charitable purpose within the meaning of § 12-81 (7), then the defendant would be entitled to judgment as a matter of law notwithstanding the existence of material facts in dispute. We, therefore, briefly address that issue.

We agree with both the trial court and the Appellate Court that the plaintiff is not disqualified from receiving a tax exemption pursuant to § 12-81 (7) merely because its purpose is to provide care and protection to sick or otherwise distressed horses. As the Appellate Court explained in rejecting the defendant's claim to the contrary, this court "has recognized that the definition of charitable uses and purposes has expanded with the advancement of civilization and the daily increasing needs of men. . . . It no longer is restricted to mere relief of the destitute or the giving of alms but comprehends activities, not in themselves self-supporting, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and more likely that they will become useful citizens. . . . Charity embraces anything that tends to promote the well-doing and the well-being of social man. . . . An institution is charitable when its property and funds are devoted to such purposes as would support the creation of a valid charitable trust. . . . *United Church of Christ* v. *West Hartford,* [206 Conn. 711, 719–20, 539 A.2d 573 (1988)].

"Despite the broadened definition of charitable uses and purposes, however, the defendant claims that the plaintiff cannot be considered a charitable organization because it promotes the well-being of horses, not that of social man. In addressing this claim, the [trial] court noted that the [plaintiff's] purpose . . . is obviously designed to serve the well-being of horses. Furthermore, the [trial] court concluded that the promotion of this purpose has long been understood to promote the well-being of social man. In *Shannon* v. *Eno,* 120 Conn. 77, 81, 179 A. 479 (1935), [the] [c]ourt construed a will provision that called for setting aside $2000 for the purpose of founding and supporting a Catery . . . for the care of homeless animals and boarders. . . . In concluding that this will provision created a charitable trust, the court noted that [t]he intention of the testatrix in making the gift . . . was obviously to afford care and protection to and alleviate the sufferings of that class of animals which by domestication contribute to comfort, pleasure

standards governing our review of a trial court's decision to grant a motion for summary judgment are well established. Practice Book [§ 17-49][7] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. Practice Book [§ 17-46]."[8] (Citations omitted; internal quotation marks omitted.) *Appleton* v. *Board of Education*, 254 Conn. 205, 209,

and well being of man; and it is not questioned that such a gift is a proper charitable use. . . . Id., 82.

"In the present case, it also is obvious that the [plaintiff's] purpose . . . is to give care and protection to a class of animals that contribute to the comfort, pleasure and well-being of people. Because such a purpose supports the creation of a valid charitable trust and because an institution is charitable when its property and funds are used for such purposes as would support the creation of a valid charitable trust . . . we conclude that the plaintiff . . . is a charitable institution." (Citations omitted; internal quotation marks omitted.) *H.O.R.S.E. of Connecticut, Inc.* v. *Washington*, supra, 57 Conn. App. 47–48. Therefore, should the plaintiff establish that it uses its property exclusively for purposes of carrying out the objectives enumerated in its corporate charter, it is entitled to a property tax exemption under § 12-81 (7).

[7] Practice Book § 17-49 provides: "The judgment sought shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

[8] Practice Book § 17-46 provides: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto."

757 A.2d 1059 (2000). "A material fact . . . [is] a fact which will make a difference in the result of the case." (Internal quotation marks omitted.) *Hammer* v. *Lumberman's Mutual Casualty Co.*, 214 Conn. 573, 578, 573 A.2d 699 (1990). Finally, the scope of our review of the trial court's decision to grant the plaintiff's motion for summary judgment is plenary. See, e.g., *Doucette* v. *Pomes*, 247 Conn. 442, 453, 724 A.2d 481 (1999).

Our review of the defendant's claim also is informed by the "settled rule of law that statutes which exempt from taxation are to be strictly construed against the party claiming an exemption. . . . Exemptions, no matter how meritorious, are of grace, and must be strictly construed. They embrace only what is strictly within their terms." (Citations omitted; internal quotation marks omitted.) *United Church of Christ* v. *West Hartford*, 206 Conn. 711, 718, 539 A.2d 573 (1988). "It is also well settled that the burden of proving entitlement to a claimed tax exemption rests upon the party claiming the exemption." (Internal quotation marks omitted.) Id., 719.

With these principles in mind, we turn to the defendant's claim that the Appellate Court improperly upheld the trial court's decision to grant the plaintiff's motion for summary judgment. Certain additional facts, however, are necessary to our resolution of that claim.

In support of its opposition to the plaintiff's motion for summary judgment, the defendant relied on the following testimony of Wahlers, which was taken at a deposition on January 23, 1997:

"[William C. Franklin, counsel for the defendant]: . . . During the time you have been on Wilbur Road [in Washington], have you permitted anyone to board healthy horses there?

"[Wahlers]: Yes.

"[Franklin]: How does that work?

"[Wahlers]: They pay board. They bring the horses in. They pay board. Their horses are taken care of just as well as the others that are injured and/or sick.

"[Franklin]: Can people board healthy horses there?

"[Wahlers]: Yes. There [are] no contagious diseases. Every horse is checked before it comes through the door.

\* \* \*

"[Franklin]: What's the boarding deal? If I called you up and say, 'I have a perfectly healthy horse but I know you will take good care of it, can I board the horse there?' You say, 'Sure.' How much?

"[Wahlers]: Three hundred dollars a month.

"[Franklin]: Three hundred a month. What do I get for that?

"[Wahlers]: Everything.

"[Franklin]: I know nothing about horses.

"[Wahlers]: Okay. You will get whatever they need as far as feed, their hay. They get vitamins, electrolytes, that type of stuff. They get hoof oil and shoe shine. We make them pretty [and] everything else. They get groomed every day. If you can't be there, they get hand walked or ridden if we have your permission . . . to ride them. If people that are full-time working people . . . come up only on the weekends, it's much safer to have your horse hand walked or ridden during the week to make sure it's not a banana when you come up to ride on the weekend. They get blanketed, so on [and] so forth.

"[Franklin]: You have twenty current tenants?

"[Wahlers]: Yes.

"[Franklin]: Two are retired?

"[Wahlers]: Yes.

"[Franklin]: And of the other eighteen, how many of them are—

"[Wahlers]: Twelve boarders.

"[Franklin]: Twelve boarders and eight rehabilitation projects?

"[Wahlers]: ([Wahlers] nods).

"[Franklin]: Is that a pretty representative mix of what you have all the time? I know that the numbers change, but [have] about [one] half of your horses [been] boarders over the years?

"[Wahlers]: Yes.

"[Franklin]: How do your boarding rates compare with boarding rates around town, if you know?

"[Wahlers]: We're less expensive.

"[Franklin]: Why is that?

"[Wahlers]: I don't believe that boarding places should be getting as much money as they get. Besides, we don't have an outdoor ring, which is one of the big things."

In support of its motion for summary judgment, the plaintiff submitted the affidavit of Danielle K. Cole, dated June 27, 1997. Cole stated in her affidavit, which purports to be based upon her personal knowledge, that: (1) she had been the plaintiff's accountant since 1990; (2) the plaintiff "rescues or otherwise receives abused, neglected or abandoned horses" and "attempts to rehabilitate [them] by providing nutritional care, [medicine], exercise, and grooming in addition to professional veterinary and farrier attention"; (3) "[w]hen a horse has made suitable progress [the plaintiff] makes

the animal available for adoption"; (4) "[w]hen horses are adopted their expenses are underwritten . . . by freeing money for the care of animals that are not ready for adoption or that are unadoptable"; (5) "[e]ight . . . of the animals [then] on [the plaintiff's] property [were] formerly abused, neglected or abandoned horses that [were] being rehabilitated and [were] not [yet] adopted"; (6) "[t]welve . . . of the animals [then] on [the plaintiff's] property [were] formerly abused, neglected or abandoned horses [and] adopted by new owners . . . that [were] continuing rehabilitation that originally [had begun with the plaintiff]"; and (7) "[t]wo . . . of the animals [then] on [the plaintiff's] property belong to . . . [Wahlers'] sister . . . [Susan Wahlers], who reimburses [the plaintiff] for the cost of their necessities." (Internal quotation marks omitted.)

The determination of whether property is entitled to a tax exemption necessarily is a fact-intensive inquiry. As the Appellate Court noted, we previously have stated that "[t]he existence of a purpose that can be characterized as charitable . . . does not in itself render a corporation charitable and tax-exempt. An institution must be exclusively charitable, not only in the purposes for which it is formed and to which its property is dedicated, but also in the manner and means it adopts for the accomplishment of those purposes." (Internal quotation marks omitted.) *H.O.R.S.E. of Connecticut, Inc.* v. *Washington*, supra, 57 Conn. App. 49, quoting *Waterbury First Church Housing, Inc.* v. *Brown*, 170 Conn. 556, 562, 367 A.2d 1386 (1976). Thus, "[w]hether the property for which exemption is claimed is actually and exclusively used for . . . [charitable] purposes must be determined from the facts of the case." (Internal quotation marks omitted.) *Waterbury First Church Housing, Inc.* v. *Brown*, supra, 561, quoting *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan*, 147 Conn. 510, 514, 162 A.2d 700 (1960). The extent to which

an organization uses its property for purposes not directly related to its charitable purpose, therefore, is relevant to the determination of whether the organization's property is entitled to tax-exempt status under § 12-81 (7).

The defendant contends that the trial court improperly granted the plaintiff's motion for summary judgment in light of Wahlers' deposition testimony. In particular, the defendant relies on Wahlers' testimony that, at the time of her deposition, twelve of the twenty horses[9] on the plaintiff's property were commercial "boarders." According to the defendant, Wahlers' testimony reasonably may be interpreted to mean that those twelve horses were healthy and were not, and never have been, in need of the special care, treatment or rehabilitation that the plaintiff affords abused, neglected or abandoned horses in accordance with its charitable purpose.

We agree with the defendant that Wahlers' deposition testimony is fairly susceptible of such an interpretation. Wahlers described those twelve horses as "boarders," as distinguished from the eight "rehabilitation projects," after explaining that the plaintiff boards healthy horses for a fee. At no time did Wahlers indicate that the "boarders" to which she was referring were, or ever had been, in need of rehabilitation. Construing Wahlers' testimony in the light most favorable to the defendant, as the nonmoving party; e.g., *Miller* v. *United Technologies Corp.*, 233 Conn. 732, 745, 660 A.2d 810 (1995); it

---

[9] It is unclear whether this number includes two horses that, according to Wahlers, were "retired." Wahlers testified at her deposition that horses are cared for until they can be adopted and that, if a horse is not adopted, the plaintiff retires the horse on its property and maintains it there at no charge until its death. According to Cole's affidavit, two of the horses that were boarded by the plaintiff belong to Wahlers' sister. It is not clear which of the three categories of horses identified by Wahlers—retired, boarders or rehabilitation projects—if any, includes her sister's two horses.

reasonably may be understood to suggest that, at the time of Wahlers' testimony, over one half of the horses on the plaintiff's property were perfectly healthy, commercial boarders. As so interpreted, Wahlers' testimony gives rise to a genuine issue of material fact, namely, whether the plaintiff uses its property exclusively for charitable purposes within the meaning of § 12-81 (7) in light of the number of healthy, commercially-boarded horses that are maintained on the plaintiff's property in relation to the number of horses that are boarded there because of their need for special care or rehabilitation.

The plaintiff asserts that any ambiguity in Wahlers' deposition testimony regarding the number of completely healthy, commercially-boarded horses is clarified by a statement in Cole's affidavit that each of the twelve boarders was, at one time, sick, abused or neglected, and, although those horses had been adopted, they continued to need rehabilitative care. Although the explanation posited by the plaintiff is plausible, it does not represent the *only* reasonable inference that may be drawn from the two sets of sworn statements. As we have indicated, those statements also may be viewed as inconsistent. Because we must view the statements in the manner most favorable to the position advanced by the defendant as the nonmoving party; e.g., id.; we are not at liberty to resolve that latent factual discrepancy in the plaintiff's favor. Moreover, we cannot say that the potential conflict between Wahlers' deposition testimony and Cole's affidavit regarding the status of the horses being cared for by the plaintiff is immaterial to the issue of whether the plaintiff uses its property exclusively for charitable purposes as required under § 12-81 (7). We, therefore, conclude that summary judgment was inappropriate and that, consequently, the Appellate Court improperly affirmed the judgment of the trial court.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to remand the case to the trial court for further proceedings according to law.

In this opinion the other justices concurred.